IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:11-CR-19-TCB-CCH |
| CALIXTO MARTINEZ-LEAL | : | |
| ALFONZO DELGADO-PAZ | : | |

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to file an objection to the Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to 18 U.S.C. 3161(h)(1)(D), the above referenced fourteen (14) days allowed for filing objections are **EXCLUDED** from the computation of time under the Speedy Trial Act. At the end of such fourteen-day period, if there are no

objections, the Clerk is **DIRECTED** to submit this Report and Recommendation to the District Judge. If there are objections, the other party or parties shall have fourteen (14) days from the filing of those objections to respond, and that fourteen-day period shall also be **EXCLUDED** from the computation of time under the Speedy Trial Act. Thereafter, the Report and Recommendation along with any objections and responses shall be submitted to the District Judge.

After such submission of this Report and Recommendation to the District Judge, whether or not any objection has been filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time under the Speedy Trial Act the time, up to thirty (30) days, that this Report and Recommendation is under advisement before the District Court. *Henderson v. United States*, 476 U.S. 321, 331 (1986) (the Speedy Trial Act "exclude[s] all time that is consumed in placing the trial court in a position to dispose of a motion"); *United States v. Mers*, 701 F. 2d 1321, 1337 (11th Cir. 1983) ("[T]he magistrate and the district court have thirty days each during which to take pretrial motions under advisement.").

IT IS SO ORDERED this 6th day of July, 2011.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                                 :
          v.                 :  CRIMINAL ACTION NO.
                                 :  1:11-CR-19-TCB-CCH
CALIXTO MARTINEZ-LEAL      :
ALFONZO DELGADO-PAZ        :

## <u>REPORT AND RECOMMENDATION</u>

Defendants Calixto Martinez-Leal ("Martinez") and Alfonzo Delgado-Paz ("Delgado") are charged in the indictment with one count of conspiring with the intent to distribute controlled substances and one count of possessing a controlled substance (methamphetamine) with the intent to distribute it, all in violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2. This action is before the Court on the Motion to Suppress Evidence and Statements [33] filed by Defendant Delgado, the Motion to Suppress Evidence [34] filed by Defendant Martinez, and the Motion to Suppress Statements [35] filed by Defendant Martinez (collectively the "Motions to Suppress").

The Court held an evidentiary hearing on the Motions to Suppress on March 23 and March 25, 2011, and transcripts of the hearing [44][45] were filed on April 8, 2011. Thereafter, Defendant Delgado filed a post-hearing brief [46] in support of his Motion to Suppress on April 25, 2011, Defendant Martinez filed a post-hearing brief

[48] in support of his Motions to Suppress on May 2, 2011, and the Government filed a consolidated response brief [49] to all the Motions to Suppress on May 16, 2011. Defendants had until May 23, 2011, in which to file reply briefs in support of their motions, but did not do so; thus, the motions became ripe for resolution by the Court on May 24, 2011. Having heard the evidence and having reviewed the transcript of the evidentiary hearing and the briefs of the parties, the undersigned **RECOMMENDS** that the Motion to Suppress Evidence and Statements [33] filed by Defendant Delgado be **DENIED**, the Motion to Suppress Evidence [34] filed by Defendant Martinez be **DENIED**, and the Motion to Suppress Statements [35] filed by Defendant Martinez be **DENIED**.

## FINDINGS OF FACT

1.   Agent David Noe[1] is employed by the Clayton County Sheriff's Department and works as a task force agent with the Task Force Group of the Drug Enforcement Administration ("DEA"). *See* Transcript of March 23, 2011 Hearing ("T.") at 14.

---

[1] In the transcript of the March 23, 2011 hearing, Agent Noe spells his name as "Noa." T. at 13. Because both the Government and Defendants refer to him as "Agent Noe" in their motions and briefs, however, the Court will also refer to him as "Agent Noe" herein.

2.    Agent Noe participated in the investigation which led to the arrest of Defendants Delgado and Martinez, an investigation that began either late on the night of November 28 or in the early morning hours of November 29, 2010, when an individual named Juan Jorge Vela Galvez ("Galvez") contacted the Gwinnett County 911 to report that he believed he had overdosed on drugs. T. at 16, 17.

3.    A Gwinnett County detective interviewed Galvez at Gwinnett County Medical Center, and Galvez gave the detective information that was used to obtain a search warrant for a residence on Newberry Road in Norcross, in Gwinnett County. T. at 17.

4.    During the execution of the search warrant, detectives discovered and seized approximately 200 pounds of finished "crystal ice" and approximately 200 gallons of an "ice slurry" or a "methamphetamine slurry," for a total amount of approximately 960 pounds of methamphetamine, which was valued at over 40 million dollars. T. at 17.

5.    On November 30, 2010, Agent Noe, along with another Task Force Agent, Agent David Aguilar, interviewed Galvez at the Gwinnett County Jail. T. at 18.

6.      During that interview, Galvez informed Agents Noe and Aguilar that an individual named Abraham Martinez had recruited Galvez to process methamphetamine at the house that had been searched, and that Abraham Martinez had someone named "Omar" who worked with him. T. at 18.

7.      Galvez also informed Agents Noe and Aguilar that the organization was controlled by someone in Mexico named "Paco," that they would transport liquid methamphetamine to Atlanta in tractor trailers, and that he had observed Abraham Martinez and Omar siphon liquid methamphetamine out of the diesel fuel tanks of tractor trailers at a location somewhere near the house on Newberry Road. T. at 19, 45.

8.      Prior to interviewing Galvez, Agent Aguilar had executed a search warrant at a hotel room and had found a phone number for a cellular telephone. T. at 19-20.

9.      Galvez informed Agents Noe and Aguilar that when he arrived in Atlanta, Abraham Martinez had taken him to a phone store and had bought two phones. T. at 20.

4

10.  Through the information obtained from Galvez, and the analysis of the telephone toll records, Agent Noe discovered that the telephone seized by Agent Aguilar during the search of the hotel room had been purchased the day before Galvez's phone, and that it likely belonged to Abraham Martinez. T. at 306-07.

11.  Based on the discovery of the drugs at the house on Newberry Road and the information provided by Galvez, Gwinnett County had secured an arrest warrant for Abraham Martinez. T. at 20.

12.  In attempting to locate Abraham Martinez, an agent obtained a GPS search warrant for that cellular telephone number that had been discovered in the hotel room. T. at 20.

13.  When the agents activated the GPS search warrant for that cellular telephone number on December 17, 2010, it revealed that the phone was in Mississippi, traveling east on I-20; it eventually stopped in or around Birmingham for around four and a half hours. T. at 20-21.

14.     Agents were sent towards Birmingham to try to locate the vehicle that was carrying the phone, and there were four or five agents traveling "up and down I-20 trying to catch up with the ping [GPS] data" to locate the vehicle. T. at 21.

15.     When the GPS data revealed that the phone was close to Atlanta, Agent Noe followed the GPS data on the computer in his car to the exit ramp for Fulton Industrial Boulevard, and pulled up next to a brown Ford Edge with a Mexico tag on it. T. at 21.

16.     The brown Ford Edge then traveled onto I-285, and the GPS data showed that the phone also traveled onto I-285. T. at 21.

17.     Agent Noe followed the brown Ford Edge to the Comfort Inn and Suites off Pleasant Hill Road in Gwinnett County. T. at 21.

18.     Two individuals from the vehicle, later identified as Defendant Martinez and Juan Delgado-Paz (who is the brother of Defendant Delgado), went into the Comfort Inn to check into the hotel, and agents also went into the hotel to check in. T. at 22.

19.    A third person, later identified as Defendant Delgado, also appeared at the hotel and the clerk at the hotel informed the agents that she believed that Delgado had also come from the same car as the other two men. T. at 22.

20.    The agents conducted surveillance on the three individuals (the two Defendants and Juan Delgado-Paz) and followed them as they left the hotel, went to a house on Payne Road, and then went back to the hotel. T. at 22.

21.    The agents spent the next few days working on an investigation in Birmingham, and did not resume surveillance over the three individuals until December 21, 2010. T. at 22.

22.    On December 21, 2010, the agents resumed surveillance at the Comfort Inn and discovered from the desk clerk that the two subjects in Juan Delgado-Paz's room had checked out of the hotel, and they observed Defendant Martinez leave the hotel and move to a Holiday Inn. T. at 23.

23.    The agents conducted surveillance of the three individuals as they traveled in the brown Ford Edge, and observed them going to three or four different banks, and then back to the Comfort Inn. T. at 23, 186.

24.     Thereafter, the clerk at the Comfort Inn advised the agents that Martinez was
        checking out of the Comfort Inn. T. at 23.

25.     The agents then followed the three subjects to the Holiday Inn, and the desk
        clerk informed the agents that the subjects had checked out of that hotel also.
        T. at 24.

26.     At that time, DEA Group Supervisory Special Agent Keith Cromer also learned
        from employees of the Holiday Inn that the subjects stayed at the hotel on
        numerous occasions, had been in the Atlanta area during the time of the
        Newberry Road seizure, and had accumulated a high dry cleaning bill as a
        result of a chemical smell on their clothing. T. at 184-186.

27.     The Holiday Inn employees had also advised Agent Cromer that Defendant
        Delgado was the driver of the red tractor with Texas plates that was parked
        outside the hotel. T. at 185.

28.     The agents observed Defendant Delgado leave the Holiday Inn and walk to the
        red tractor. T. at 24.

29.  The agents then observed Defendant Martinez and Juan Delgado-Paz come out of the hotel, get into the Ford Edge, and the Edge drove across the interstate, followed by the red tractor, and went to a restaurant called La Pantera Rosa, where they stayed for approximately 40 or 45 minutes. T. at 24.

30.  After the subjects left La Pantera Rosa, the agents observed Defendant Delgado walk to the red tractor, and a short time later Defendant Martinez went to the passenger door of the tractor, climbed up and stuck his head into the tractor, never fully entering it. T. at 24, 70-71.

31.  Defendant Delgado then got into the tractor, and Martinez and Juan Delgado-Paz got into the Ford Edge, and both vehicles left La Pantera Rosa. T. at 25.

32.  The agents followed the Ford Edge to the Wal-Mart at Lawrenceville Highway and Pleasant Hill. T. at 25.

33.  The tractor traveled onto I-85 heading southbound, and Agent Noe contacted Trooper Mark Mitchell of the Georgia State Patrol to advise him that a tractor that may have been involved in the seizure of 900 pounds of methamphetamine was heading southbound on I-85 and that they may want him to stop the vehicle if it approached him. T. at 25.

9

34.     Agent Noe testified that, at the time he contacted Trooper Mitchell, he was not

        sure what they were planning to do with the investigation at that time, but he

        wanted to identify the drivers and to determine whether the tractor was the

        same tractor trailer that Galvez had mentioned. T. at 25.

35.     Agent Noe also informed Trooper Mitchell that methamphetamine may have

        been stored in the diesel fuel tanks of the tractor. T. at 25-26.

36.     While other agents followed the tractor, Agent Noe followed the Ford Edge to

        the Wal-Mart where he observed Martinez and Juan Delgado-Paz purchase a

        plastic container, bring it out to the car, and leave. T. at 26.

37.     The agents then followed the Ford Edge to a Shell gas station at Jonesboro

        Road right off I-85 in Union City, and the Ford Edge pulled up to a gas pump

        to get gas. T. at 26.

38.     After the individuals in the Ford Edge had finished pumping gas, Agent Noe

        approached Defendant Martinez on the passenger side of the vehicle while

        DEA Agent Harvey approached Juan Delgado-Paz, who was the driver of the

        vehicle. T. at 27-28.

39.    Agent Noe parked behind the Edge, but did not block the vehicle. T. at 28.

40.    Agent Harvey pulled up to the left front corner of the Edge, partially blocking the vehicle. T. at 298.

41.    When Agent Noe approached Martinez, Martinez was outside the Ford Edge. T. at 28.

42.    Agent Noe, who was dressed casually and was not armed, identified himself as a police officer, showed Martinez his badge and credentials, and asked Martinez if he could talk to him and Martinez said "yes." T. at 28, 83.

43.    Agent Noe asked Martinez about the nature of his business in Atlanta, and Martinez responded that he was in town to purchase cars, and then went to the Ford Edge and took out some titles to vehicles from inside the vehicle to show to Agent Noe. T. at 28, 84.

44.    Agent Noe spoke with Martinez in English, and Martinez appeared to understand him, responding in "very good English." T. at 29, 84.

11

45.     Agent Noe asked Martinez if he had any identification, and Martinez showed
        him identification for "Calixto Leal-Martinez" [sic] in the form of a Mexico
        driver's license, or passport, or both. T. at 86.

46.     Agent Noe showed Martinez a picture of "Abraham Martinez" and asked
        Martinez if he was the individual in the picture, and Martinez replied "that's not
        me." T. at 77, 86.

47.     Agent Noe asked Martinez if he knew the person in the photograph and
        Martinez responded that he had never seen him before. T. at 86.

48.     Agent Noe noticed that the gas station was becoming crowded, and Noe asked
        Martinez and Juan Delgado-Paz if "they were willing to move." T. at 29, 87.

49.     Agent Harvey then asked them: "Are you willing to go to an empty parking lot
        with us? And you're not under arrest and you don't have to go if you don't
        want to, but we would like for you to go so we can finish this conversation." T.
        at 29, 87-88.

50.     In response, Martinez said "okay." T. at 29.

51.    Agent Noe pointed towards his car and asked Martinez if he wanted to ride with him, and Martinez responded "okay." T. at 29, 87-88.

52.    Martinez then got into the passenger seat of Agent Noe's truck, and Agent Noe drove approximately 125 yards behind the Shell station to a Sears parking lot. T. at 29-30.

53.    Martinez was not handcuffed, and he and Agent Noe were the only people in the vehicle. T. at 30.

54.    At the Sears parking lot, Agent Noe exited his vehicle for about five to six minutes to speak with Juan Delgado-Paz. T. at 89-90.

55.    During the few minutes that Agent Noe was speaking to Juan Delgado-Paz, Martinez sat in the front seat of Noe's truck while the driver's side door was open. T. at 90.

56.    Upon returning to his vehicle, Agent Noe spoke with Martinez and asked him about the nature of his trip to Atlanta and what he did with used cars. T. at 30.

57.    During the conversation, Martinez was sitting in the passenger seat of Agent Noe's vehicle and Agent Noe was standing in the driver's door. T. at 30.

58.     Agent Noe asked Martinez what his telephone number was, and Martinez gave a number with a "305" area-code and claimed that he had just changed his number the day before. T. at 31, 91.

59.     Agent Noe asked Martinez if he would allow him to look in the telephone and Martinez handed his phone to Agent Noe. T. at 31.

60.     Agent Noe looked at the phone, and scrolled through some of the numbers in the phone, and found that this telephone had called the number which was the subject of the GPS search warrant. T. at 31, 94.

61.     Agent Noe asked Martinez about his previous telephone number, but Martinez said he could not remember the number. T. at 31.

62.     Agent Noe handed the phone back to Martinez, and went to speak to Juan Delgado-Paz, and after a minute or two, returned to Martinez to ask him about the red tractor. T. at 94.

63.     Martinez denied knowing anything about the tractor. T. at 31-32, 94-95.

64.     Agent Noe responded by telling Martinez that he had seen Martinez getting into the red tractor, and Martinez said, "I don't understand." T. at 32.

65.   At that time, Martinez no longer appeared to understand English and spoke only Spanish. T. at 31-32, 95.

66.   Agent Noe attempted to continue speaking to Martinez with a Gwinnett County detective who spoke some Spanish acting as translator, but the conversation soon ended. T. at 32.

67.   Agent Noe testified that he spoke with Martinez for eight to fifteen minutes at the gas station, and was granted permission to look in Martinez's cell phone within five to ten minutes after arriving at the Sears parking lot. T. at 33.

68.   Although Martinez was at the parking lot for about an hour and a half, Martinez's statements were made within the first ten to twelve minutes upon arriving at the parking lot. T. at 33-34.

69.   From the time that Agent Noe and Martinez arrived at the Sears parking lot, about fifteen to twenty minutes until Martinez no longer spoke English. T. at 33, 96.

70.     Agent Noe testified that he did not read Martinez his *Miranda* warnings before talking to him at the Shell station or the Sears parking lot because Martinez was not in custody. T. at 35-36.

71.     According to Agent Noe, the interview with Martinez began as a law enforcement-citizen encounter, and Martinez never asked to leave, never said that he did not want to answer questions, never asked for an attorney, and was not handcuffed or restrained at any time during the conversation. T. at 35.

72.     Agent Noe did not have any physical contact with Martinez or make him any promises. T. at 35-36.

73.     The agents did not place Martinez under arrest until sometime later, after Delgado had arrived on the scene. T. at 35.

74.     Georgia State Patrol Sergeant Mark Mitchell oversees the operation of the criminal interdiction unit, which is responsible for "patrolling the interstate highways looking for criminal activities." T. at 100.

75. Sgt. Mitchell testified that he has been employed with the Georgia State Patrol since 1994, and that he has seized drugs from tractor trailers approximately thirty to fifty times. T. at 100, 102.

76. Sgt. Mitchell received a call on December 21, 2010, from Agent Noe and other agents to request his assistance to look at a vehicle traveling southbound on I-85 that was suspected of criminal activity. T. at 102-103.

77. Agent Keith Cromer also spoke with Sgt. Mitchell prior to the traffic stop, and advised him that Delgado was believed to be transporting crystal methamphetamine in the diesel fuel tank of the tractor. T. at 103, 189.

78. Sgt. Mitchell proceeded to I-85 southbound and positioned his marked vehicle in the median. T. at 104.

79. While Sgt. Mitchell was talking to the DEA agents on his cell phone, the agents advised him that the red tractor was approaching his location. T. at 105.

80. As Sgt. Mitchell pulled onto the highway into the left passing lane, Delgado, who was driving the red tractor, "dramatically slowed" as if he was avoiding passing the marked patrol vehicle. T. at 143.

81.   When the tractor eventually passed his vehicle, Sgt. Mitchell noticed a large crack in the tractor's front windshield in violation of O.C.G.A. Section 40-8-73. T. at 105-106.

82.   While following the tractor, Sgt. Mitchell also observed the tires of the vehicle cross over the right white lane line in violation of O.C.G.A. Section 40-6-48. T. at 106-107, 112-113.

83.   Sgt. Mitchell followed the tractor for approximately a mile and a half before activating his lights and initiating a traffic stop of the tractor. T. at 107.

84.   Sgt. Mitchell testified that he initiated the stop of the tractor at 2:00 p.m. T. at 116.

85.   The tractor stopped in a timely manner just ahead of a weigh station entrance, and Sgt. Mitchell got on his P.A. system and asked the driver to move into the weigh station. T. at 107.

86.   According to Sgt. Mitchell, the driver of the tractor, who he identified as Defendant Delgado, was cooperative, but "very nervous, fidgety, had a lot of furtive hand movements, arm movements, rubbing his ear with his left hand –

18

rubbing his right ear with his left hand, definitely was more nervous than the general commercial motor vehicle drivers that I stop." T. at 108.

87.    Sgt. Mitchell, speaking in English, explained the reason for the stop to Delgado, and, consistent with all traffic stops of truck drivers, Sgt. Mitchell asked to see Delgado's driver's license and required documents to operate a commercial motor vehicle. T. at 108, 110.

88.    Delgado failed to present a valid commercial driver's license, but instead presented a Mexican driver's license. T. at 108.

89.    Delgado told Sgt. Mitchell that he lived in Texas but he had failed the Texas commercial driver's license test, and that was why he only had a Mexican driver's license. T. at 109.

90.    Sgt. Mitchell testified that it is illegal to operate a vehicle on a Mexican driver's license in the United States when the driver is a resident of the United States. T. at 109.

91.   Sgt. Mitchell also asked Delgado for his log book, which is a document that logs the hours driven by a truck driver and is required to be maintained by all truck drivers for safety reasons. T. at 109.

92.   Sgt. Mitchell testified that Delgado's log book was "completely incorrect" and was "not properly filled out." T. at 109-110, 136-137.

93.   According to Sgt. Mitchell, the log book "was filled out by somebody that did not know the rules and regulations that must be followed to drive a commercial motor vehicle." T. at 110.

94.   Sgt. Mitchell asked Delgado various questions about his trip to Atlanta, and Delgado informed Sgt. Mitchell that he had come to Atlanta to pick up a bobtail tractor to take back to Texas, but something was wrong with the title so he was going back without the other tractor. T. at 110.

95.   In an attempt to positively identify Delgado, Sgt. Mitchell asked Delgado to take his identifications out of his wallet. T. at 116, 145.

96.    Sgt. Mitchell then returned to his patrol vehicle and performed a records check on Delgado to determine if there were any outstanding warrants, but did not discover any records. T. at 116.

97.    At some point during the traffic stop of the tractor, Deputy Nathan Taylor arrived on the scene as back up. T. at 117.

98.    After five or ten minutes, Sgt. Mitchell returned to speak with Delgado and asked Delgado in English for consent to search the tractor. T. at 116-117.

99.    Delgado agreed verbally to allow a search of the tractor. T. at 118.

100.   Sgt. Mitchell then handed Delgado a consent-to-search form from the Georgia State Patrol, which was written in both English and Spanish, and told him to read over the form, make sure he understood the form, and that he could sign in the English, or Spanish, or both. T. at 118; Gov. Ex. 4.

101.   Sgt. Mitchell testified that Delgado appeared to read the form and signed the English and Spanish versions. T. at 119.

102.   Sgt. Mitchell believed that Delgado "understood he was giving consent free and voluntarily." T. at 119.

103. The consent form stated:

> I, Alfonso Delgado, hereby grant my consent to Mitchell,
> Deputies, Troopers of the Georgia State Patrol to search the
> following described vehicle including luggage, containers,
> and contents of all. This includes the removal of any
> suspicious paneling or other vehicle components and the
> least intrusive access to any constructed compartment used
> for the purpose of concealing contraband. . . . I understand
> that I have the right to refuse to consent to the search
> described above and to refuse to sign this form. I further
> state that no promises, threats, force, physical or mental
> coercion of any kind whatsoever have been used against me
> to get me to consent to the search described above or to
> sign this form. My consent is freely and voluntarily given.

Gov. Ex. 4.

104. According to Sgt. Mitchell, it had been about 27 or 28 minutes after he initiated the stop of the tractor before he asked for consent to search. T. at 117-118.

105. Sgt. Mitchell testified that Delgado never indicated that he did not want to consent to the search and did not ask any questions prior to signing the form. T. at 122.

106. Sgt. Mitchell did not make Delgado any promises to induce consent, use any physical force with him, or handcuff or restrain Delgado at anytime during the traffic stop. T. at 123.

22

107. Sgt. Mitchell focused his search on the fuel tanks, and noticed that the driver's side fuel cell had an after-market security latch added to the cap. T. at 125.

108. Despite all of his experience, Sgt. Mitchell had not previously observed such a device and became suspicious. T. at 125-26.

109. The special latch was not present on the passenger side fuel tank. T. at 135.

110. Sgt. Mitchell also observed excessive wear around the screws of the paneling on each side of the driver's side fuel tank, indicating that the paneling had been taken on and off. T. at 126.

111. Sgt. Mitchell further observed a white crystalized substance on the rear of the driver's side tank and removed the panels for further inspection. T. at 126-27.

112. Sgt. Mitchell could clearly see that the substance appeared to be crystal methamphetamine. T. at 127.

113. He was "almost sure" that he observed this substance before he removed the panels. T. at 127.

114.  After removing the panels, Sgt. Mitchell tested the substance with a field test that tested positive for crystal methamphetamine. T. at 127.

115.  Sgt. Mitchell did not remove any other paneling or components, nor did he damage the tractor in any way. T. at 128.

116.  Sgt. Mitchell testified that agents later executed a search warrant on the tractor, and removed a larger quantity of methamphetamine inside of the tank. T. at 128.

117.  Sgt. Mitchell issued Delgado citations for his improper license and log book, and warnings for the failure to maintain lane and windshield violations. T. at 137-38.

118.  Sgt. Mitchell never arrested Delgado, who later departed the scene with Agent Cromer. T. at 139.

119.  Sgt. Mitchell acknowledged that Delgado, who did not have a valid license to drive the tractor, could not have departed the scene of the traffic stop on his own. T. at 151.

120.   According to Sgt. Mitchell, he believed he had sufficient reason to arrest Delgado at that time based on the discovery of the substance that tested positive for methamphetamine. T. at 168-169.

121.   After Delgado left the scene with Agent Cromer, Sgt. Mitchell did not have any further communication with Delgado. T. at 169.

122.   DEA Agent Keith Cromer became a Special Agent with the DEA in 1999 and has been a Group Supervisor at the DEA since February of 2010, a position in which he supervises twelve agents. T. at 181.

123.   At approximately 2:30 p.m., Agent Cromer arrived at the scene of the traffic stop and Sgt. Mitchell advised him of what had happened and told him that there appeared to be something wrong with the fuel tanks. T. at 191, 197.

124.   Agent Cromer then introduced himself in English to Delgado, and informed him that he was with the DEA. T. at 191, 225.

125.   While Agent Cromer spoke with Delgado, Sgt. Mitchell was inspecting and looking at the truck. T. at 195.

126. Agent Cromer was casually dressed and not in any type of uniform, and his weapon was not visible. T. at 192.

127. Agent Cromer advised Delgado that he was following up on an investigation and would like to speak with him. T. at 191.

128. According to Agent Cromer, Delgado said "he didn't have no problems," and agreed to speak to him and Investigator Estrada, who was with Agent Cromer. T. at 191-192.

129. Agent Cromer began the conversation by asking Delgado some general questions in English, including his name, hometown, and occupation "just to establish some rapport with him so he understood who I was and he felt comfortable with that." T. at 192.

130. According to Agent Cromer, Delgado appeared to understand the questions. T. at 192.

131. Although Agent Cromer communicated with Delgado in English, if Delgado did not appear to understand a question, Investigator Estrada was there clarify if he did not understand something. T. at 229-230.

132.   Agent Cromer then asked Delgado if he had traveled to Atlanta with anyone, and Delgado said "no." T. at 193.

133.   Agent Cromer told Delgado that he had seen him with some other men that he knew Delgado was here with, and Delgado said yes, he acknowledged that he was. T. at 193.

134.   Agent Cromer asked Delgado who the other people were, and he said one was his brother Juan, and the "old man." T. at 193.

135.   Based on his observation of the appearance of the three, Agent Cromer understood the "old man" to refer to Martinez. T. at 193.

136.   Delgado told Agent Cromer that they had all come to Georgia and had arrived a couple of days before. T. at 193.

137.   Delgado said that "his brother and Calixto had driven in the Ford Edge and he had driven the tractor and they all had arrived on [sic] a couple of days before at the Comfort Inn and Suites." T. at 193.

138.   Delgado said that they had traveled in tandem from McAllen, Texas to Atlanta. T. at 194.

139.   At some point during this conversation, Sgt. Mitchell called Agent Cromer over to look at the gas tank on the tractor, and showed him a white crystallized substance that appeared to be crystal methamphetamine on the bottom of the gas tank. T. at 196.

140.   Agent Cromer asked Sgt. Mitchell to preserve the crystal methamphetamine in an evidence bag, and returned to speak with Delgado. T. at 196.

141.   Agent Cromer again asked Delgado what he was doing in Atlanta. T. at 198.

142.   Delgado initially claimed that he was in Atlanta to purchase a truck, but then acknowledged that a friend named "Mario" had asked him to obtain some items from a house on Payne Road in Gwinnett County. T. at 195.

143.   Agent Cromer then asked Delgado if there was anything at the house on Payne Road. T. at 198.

144.   Delgado responded that he was "more than willing" to take Agent Cromer back to the house and show the agents that there was nothing in the house because "there's nothing there." T. at 198-199.

145.   Agent Cromer then asked Delgado, "well, did something happen with the fuel tanks?" T. at 198.

146.   Delgado responded that "Mario" and Martinez had told him that there was "special fuel" in the fuel tank. T. at 198.

147.   Delgado also said that when he arrived in Atlanta with the tractor, an individual named "Shaparo" was the intended recipient of the tractor, and that an associate of "Shaparo" had picked up the tractor and taken it away, and then they brought the tractor back to him. T. at 199.

148.   Agent Cromer asked Delgado if he believed that the special fuel contained illegal drugs, and Delgado said "yes." T. at 200, 255-257.

149.   While at the scene of the traffic stop, Agent Cromer told Delgado several times that he was not under arrest and did not have to speak with him. T. at 200.

150.   Agent Cromer also expressed his appreciation to Delgado for his cooperation in the investigation. T. at 201.

151.   Agent Cromer testified that he did not give Delgado his *Miranda* warnings because he believed that Delgado was not in custody. T. at 204-05.

29

152.   Agent Cromer spoke with Delgado for about fifteen to twenty minutes at the scene of the traffic stop. T. at 207.

153.   Before leaving the scene to travel to the house on Payne Road, Agent Cromer told Delgado that there were some other agents with his brother and Martinez at another location and Agent Cromer would stop there first. T. at 209.

154.   In response, Delgado said "no problem. That's fine." T. at 209.

155.   Agent Cromer never told Delgado that he had to go with him to meet with the other agents. T. at 209.

156.   Agent Cromer, Delgado, and Investigator Estrada left the scene of the traffic stop in Agent Cromer's vehicle to head to Shannon Mall to meet the other agents. T. at 208.

157.   Delgado rode in the front seat of the vehicle while Investigator Estrada sat in the backseat. T. at 208.

158.   Delgado was not handcuffed while riding in Agent Cromer's vehicle. T. at 208.

159.   On the drive to Shannon Mall, Agent Cromer reiterated that Delgado was not under arrest and that the agents appreciated his cooperation. T. at 209.

160.   During that drive, Delgado stated that he had been to Atlanta previously with Martinez and Mario. T. at 214.

161.   Agent Cromer testified that he had not made a decision to arrest Delgado at that point, and was considering letting him return to Texas to cooperate further in the investigation. T. at 209, 265-66.

162.   After stopping briefly at the Sears parking lot, and on the way to the Payne Road residence, Agent Cromer, Investigator Estrada, and Delgado stopped for dinner at a Popeye's restaurant. T. at 211.

163.   They arrived at the Popeye's restaurant at approximately 4:30 or 4:45 p.m. T. at 225-26.

164.   Agent Cromer testified that Delgado went into the restaurant by himself while Agent Cromer stayed in the car, joining Delgado inside 10 or 15 minutes later. T. at 211-12.

165. Inside the restaurant, Delgado sat down at a table and ate with the agents. T. at 212.

166. The group was at the Popeye's restaurant for 35 or 40 minutes. T. at 226.

167. In the ten minute drive from Popeye's to the Payne Road residence, Delgado told Agent Cromer that the tractor would be turned over to someone in Atlanta and returned to him at the Holiday Inn. T. at 216-217, 226.

168. Agent Cromer also testified that while en route to the house on Payne Road, Delgado pointed out the location of the warehouse where he had previously dropped off the tractor. T. at 219.

169. While at the Payne Road residence, Delgado also volunteered to show Agent Cromer another warehouse where he had turned over the tractor to "Shaparo." T. at 220-221.

170. After viewing the warehouses, Agent Cromer and Delgado eventually met up with Agent Noe at a shopping center at approximately 6:30 or 6:45 p.m. T. at 225-26.

171.    Agent Cromer testified that he never threatened Delgado, never told him that he could not leave, and told him six to eight times throughout the day that he did not have to cooperate. T. at 226-27.

172.    In response, Delgado acknowleged that he understood, but wanted to tell Agent Cromer everything about his involvement. T. at 227.

173.    Agent Cromer explained that his "whole point and intention" was to let Delgado "go back to the McAllen, Texas area." T. at 227.

174.    After speaking with Agent Noe at the shopping center, however, Agent Cromer made the decision to arrest Delgado at that time. T. at 228.

175.    Specifically, Agent Noe reminded Agent Cromer that Delgado was involved in the seizure of nearly one thousand pounds of crystal methamphetamine and his safety was a concern. T. at 228.

176.    At around 7:00 p.m. or 8:00 p.m. on the day that Delgado was arrested, Agent Noe interviewed Delgado at the DEA office on the 7th floor of the Federal Building. T. at 36.

177.  Neither Agent Cromer nor Investigator Estrada was present for this post-arrest interview. T. at 272-73, 297.

178.  Agent Noe acknowledged that he spoke with Agent Cromer throughout the day, but did not consult Cromer during the post-arrest interview. T. at 296-97.

179.  During those conversations, Agent Cromer had told Agent Noe that Delgado "was cooperating with him and had advised him that he (Delgado) had made more than one trip, he advised [Cromer] that he had known that there were drugs in the diesel tank, that [Delgado] was going to take [Cromer] to Payne Road and had consented to a search and had identified two warehouses where previous tractor-trailers had been turned over to people." T. at 296.

180.  Agent Noe testified, however, that he did not use any of those statements to solicit further statements from Delgado. T. at 296-297.

181.  Agent Noe testified that he did not use the prior statements because he wanted to conduct a "chronological interview with [Delgado] of what was taking place and how and when, to get time frames and who else was involved." T. at 296-297.

182.   Prior to conducting the interview, Agent Noe read Delgado his *Miranda* rights

in English from a DEA Form 13 card. T. at 58, 61.

183.   Specifically, Agent Noe advised Delgado that:

> You have the right to remain silent. Anything you say can
> be used against you in court. You have the right to talk to
> a lawyer for advice before we ask you any questions, and to
> have a lawyer with you during questioning. If you cannot
> afford a lawyer, one will be appointed for you before any
> questioning, if you wish. Do you understand?

T. at 37-38.

184.   Delgado advised Agent Noe that he understood his rights. T. at 38.

185.   Agent Noe then asked Delgado to read the back side of the card which contains

a true and correct Spanish version of the *Miranda* rights. T. at 38.

186.   After reading the Spanish version, Delgado again told Agent Noe that he

understood his rights and would answer questions. T. at 38.

187.   Agent Noe testified that Delgado understood his rights, and was not under the

influence of drugs or alcohol. T. at 38-39.

188.   During the interview, Delgado made various statements, as memorialized in
Agent Noe's DEA-6 report of the interview that was admitted into evidence at
the hearing as Government's Exhibit 16. T. at 293; Gov. Ex. 16.

189.   The entire interview was in English and lasted 20 to 25 minutes. T. at 41, 60.

190.   Agent Noe testified that he did not threaten Delgado, promise him anything,
display any weapons to him, handcuff him, or have any physical contact with
him. T. at 41-42.

## DISCUSSION

I.   DEFENDANT DELGADO'S MOTION TO SUPPRESS

Defendant Delgado has filed a Motion to Suppress Evidence and
Statements [33]. In his post-hearing brief, Delgado argues that his statements to both
Agent Cromer and Agent Noe must be suppressed because they were obtained in
violation of his Fifth Amendment rights.

At the evidentiary hearing on the Motions to Suppress, counsel for Defendant
Delgado stated on the record that he would not be pursuing any argument related to
the suppression of the evidence found as a result of the search of the tractor: "On the

search of the truck, I am probably after reviewing the transcript not going to pursue the unlawful detention aspect that the Court just mentioned. Now that we have heard evidence, I'm unlikely to pursue that." T. at 312. Because Defendant's counsel stated on the record that he was not going to pursue that argument, and because Defendant did not argue in his post-hearing brief that any evidence should be suppressed, the undersigned deems any argument related to suppression of the evidence discovered during the search of the tractor to have been abandoned.

Furthermore, Defendant Delgado does not make any argument in his post-hearing brief challenging the legality of the traffic stop of the tractor. Thus, the undersigned also deems any argument related to the legality of the stop of the tractor to have been abandoned by Defendant Delgado.

A.     Delgado's Statements to Agent Cromer

Defendant Delgado argues that the statements he made to Agent Cromer while at the scene of the traffic stop and later, during the ride to the house on Payne Road, must be suppressed because the statements were obtained before he was given the *Miranda* warnings, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court ruled that, because custodial interrogation of arrested suspects in criminal cases is inherently coercive, statements made in response to such interrogation should be treated as presumptively coerced in violation of a defendant's Fifth Amendment rights. Thus, the Court held that a defendant's incriminating statements are not admissible as evidence against the defendant unless the defendant was advised before interrogation of his right to remain silent and his right to the presence of an attorney, including an appointed attorney if he was unable to afford one, and advised of the fact that anything he said could be used against him. *Miranda*, 384 U.S. at 478-79.

*Miranda* warnings are not required for all police encounters with citizens, however, but only when police interrogate a suspect who is in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). A suspect is said to be in custody only when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121 (1983) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Muegge*, 225 F.3d 1267, 1269-70 (11th Cir. 2000). Similarly, not all police questioning rises to the level of interrogation. "The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted).

To determine whether the government has violated a defendant's Fifth Amendment right against self-incrimination, courts focus on whether the defendant was interrogated in police custody at the time the statements were made. In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Supreme Court held that courts must look at the totality of the circumstances surrounding the interrogation to evaluate whether an individual was in custody for *Miranda* purposes. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (footnote omitted). As the Eleventh Circuit has explained:

> In order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as 'that degree associated with a formal arrest' to such extant that he would not feel free to leave. Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person.

*Muegge*, 225 F.3d at 1270 (*quoting United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987) and *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)) (citations omitted).

In the instant action, there is no dispute that Defendant Delgado was not advised of his *Miranda* warnings before he made statements to Agent Cromer. Agent Cromer testified that he did not give Delgado his *Miranda* warnings because he believed that Delgado was not in custody. Finding of Fact ("FOF") 151. Furthermore, it is also undisputed that Delgado had not been handcuffed or placed under formal arrest at the time he made the statements. FOF 149, 158. Indeed, Defendant was not placed under formal arrest until the end of the day, after Defendant had taken Agent Cromer to the house on Payne Road and to the two warehouses, when they met up with Agent Noe at a shopping center around 6:30 or 6:45 p.m. FOF 174-75. Defendant argues, however, that he was in custody at the time he spoke to Agent Cromer during the traffic stop and during the ride to the house on Payne Road.

Deciding when a suspect was taken into custody for *Miranda* purposes involves the consideration of several factors, including, among others, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of

pressure applied to the suspect, and whether the officers "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1985); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)*; United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). In this case, consideration of those factors leads to the conclusion that Defendant Delgado was not in custody at the time he was questioned by Agent Cromer.

First, the location of the initial interview was a traffic stop in a weigh station by the side of the highway. The Eleventh Circuit has held that "we are much 'less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" *Luna-Encinas*, 603 F.3d at 882 (*quoting United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (quotation marks, citation, and emphasis omitted). While a weigh station on the side of the highway is not a "familiar" location such as a suspect's home, Delgado was not questioned in a more inherently coercive location such as the police station, nor was he placed in the back of a police car.

In addition, when Delgado was asked about what was in the house on Payne Road, he responded that he was "more than willing" to take Agent Cromer back to the

41

house and show us that there was nothing in the house because "there's nothing there." FOF 144. When Delgado got into Agent Cromer's vehicle, he was not placed in the back of the vehicle but rode in the front passenger seat, while Investigator Estrada rode in the back seat, and Delgado was not handcuffed while riding in the vehicle. FOF 157-58. On the drive to Shannon Mall, Agent Cromer again told Delgado that he was not under arrest and that agents appreciated his cooperation. FOF 159. Moreover, it is undisputed that Delgado was never placed into any physical restraints such as handcuffs at any time, and there is no evidence that he was even touched or patted down by Agent Cromer. Thus, there was no degree of physical "pressure" applied to Delgado at any time. He was allowed to get out of the vehicle and go into Popeye's restaurant without any restraints while Agent Cromer sat in his vehicle for ten to fifteen minutes, and then Delgado ate dinner with Agent Cromer and Investigator Estrada for 35 or 40 minutes. FOF 162-66.

The evidence also shows that Agent Cromer never exhibited his weapon to Delgado, let alone drew it on him or brandished it in any way. Agent Cromer was casually dressed and not in any type of uniform, and his weapon was not even visible. FOF 126. With respect to the officer's demeanor and tone of voice, there is no evidence that Agent Cromer spoke to Delgado in anything but a normal tone of voice;

there is no evidence that he shouted at Delgado or ever ordered him to do anything and thus no evidence of verbal "pressure." FOF 171. In fact, according to Agent Cromer, while at the scene of the traffic stop, he told Delgado several times that he was not under arrest and did not have to speak with him. FOF 149. Agent Cromer never threatened Delgado, and told him six to eight times throughout the day that he did not have to cooperate. FOF 149, 171. Finally, the evidence indicates that Delgado never asked to leave and was fully cooperative with Agent Cromer at all times. Thus, based on all the factors set forth in *Long*, the undersigned concludes that Delgado was not in custody at the time he was questioned during the traffic stop or during the ride in Agent Cromer's vehicle.

Defendant Delgado nevertheless argues that he was in custody because Agent Cromer had probable cause to arrest him at the time of his "interrogation" and could have arrested him at any time. The Government does not dispute that there was probable cause to arrest Delgado after Sgt. Mitchell discovered the substance that tested positive for methamphetamine on the fuel tank of the tractor. The fact that an officer had probable cause to arrest a suspect, however, does not mean that he is automatically placed into "custody" at that time. *Street*, 472 F.3d at 1309 ("The fact that we have already determined that the agents had sufficient probable cause to arrest

Street . . . does not mean that Street was in custody for *Miranda* purposes from that time forward. Because there is no constitutional right to be arrested, a suspect cannot complain that officers postponed arresting him in order to obtain more incriminating statements or other evidence against him." (citing *Hoffa v. United States*, 385 U.S. 293, 310 (1966); *United States v. Archbold-Newball*, 554 F.2d 665, 675 (5th Cir.1977); *United States v. Cravero*, 545 F.2d 406, 413 (5th Cir.1977); *Koran v. United States*, 469 F.2d 1071, 1071–72 (5th Cir. 1972))).

Defendant Delgado also argues that a reasonable person in his position would not have felt free to leave, which he argues is the "critical factor" in determining whether he was in custody for *Miranda* purposes. Def. Br. at 9. The Eleventh Circuit has stated, however, that the "free to leave" test applies to determine whether a suspect has been "seized" under the Fourth Amendment, but not whether he is in "custody" for the purposes of *Miranda*.

> As some of our sister circuits have decided, a seizure does not necessarily constitute custody for *Miranda* purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when "a reasonable person would [not] feel free to terminate the encounter" with the police. By contrast, a person is in "custody" for *Miranda* purposes only when there is a "formal arrest *or restraint on freedom of movement of the degree associated with a formal arrest*."

*Street*, 472 F.3d at 1309 (citations omitted, emphasis added).

44

Thus, the "critical factor" is not whether a reasonable person in Delgado's position would have felt that he was free to leave at any time, but whether he would have felt that his freedom of movement had been restrained *to the degree associated with a formal arrest.* As discussed above, after consideration of all the factors set forth in *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1985), the undersigned finds that, based on the totality of the circumstances, Delgado was not in custody because a reasonable person in his position would not have believed that his freedom was being restrained to the degree associated with a formal arrest. Delgado was never handcuffed or physically restrained, and Agent Cromer told him repeatedly that he was not under arrest and did not have to cooperate. Delgado was allowed to get out of the police car and walk into a Popeye's restaurant while Agent Cromer sat behind in his vehicle for several minutes before joining Delgado for dinner. Under those circumstances, a reasonable person would not believe that his freedom was being restrained to the same degree as a person who had been formally arrested.

Accordingly, the Court finds that Defendant Delgado was not in "custody" at the time that Agent Cromer talked to him during the traffic stop, or during the ride in the vehicle on the way to the house on Payne Road. For that reason, his statements to

Agent Cromer are admissible even though Agent Cromer failed to advise him of his *Miranda* warnings before interviewing him.

B.    Delgado's Statements to Agent Noe

Defendant Delgado also argues that his statements to Agent Noe that were made after he was advised of his *Miranda* warnings must be suppressed. He contends that Agent Cromer and Agent Noe, working together, used a "question first" approach to coerce him into making incriminating statements in response to probing questions, and then gave him his *Miranda* warnings, after which he was again subjected to the same questions to which he had already made the incriminating statements. He argues that his statements to Agent Noe must be suppressed under the Supreme Court's holding in *Missouri v. Siebert*, 542 U.S. 600 (2004).

The undersigned rejects Delgado's argument on two grounds: First, as discussed above, because he was not in "custody" for the purposes of *Miranda* at the time he was questioned by Agent Cromer, his statements to Agent Cromer are admissible even in the absence of *Miranda* warnings. Second, even if he was in custody at the time Agent Cromer interviewed him and his statements made to Agent Cromer were deemed inadmissible as a result, the statements he gave to Agent Noe

46

would still be admissible because they were made after he was given *Miranda* warnings and voluntarily chose to waive his right to remain silent. There is no evidence in the record that Agent Cromer and Agent Noe conspired to create a "question first" scheme to trick Delgado into making incriminating statements before he had been given his *Miranda* warnings.

In cases in which a law enforcement officer properly administers the *Miranda* warnings before a defendant makes a statement, a defendant challenging the admission of a statement made subsequent to the warnings must point to evidence tending to show that the statement was nonetheless "coerced, compelled or involuntary." *United States v. Lawrence*, 889 F.2d 1187, 1189 (1st Cir. 1989). The focus of the voluntariness inquiry is on whether the defendant was coerced into making the statement. "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).

The Supreme Court has held that a person's waiver of his *Miranda* rights is valid if the totality of the circumstances indicates that the person understood the nature of the rights and the consequences of waiving those rights and further, that the

statement was freely and voluntarily made. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> Echoing the standard first articulated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 475, 86 S. Ct. at 1612, 1628. The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (citations omitted); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

In this case, Delgado does not dispute that Agent Noe advised him of the *Miranda* warnings before interrogating him at the Russell Federal Building. Delgado also does not dispute that he signed a form acknowledging that he had been advised of his rights, and that, despite being advised of his right to remain silent, he answered Agent Noe's questions during the interrogation. Delgado nevertheless argues that his statements to Agent Noe should be suppressed because the questioning from Agent

Cromer and Agent Noe should be treated as one integrated interrogation; he contends that the officers employed a "question first" strategy and deliberately withheld the *Miranda* warnings until after he had already made incriminating statements, which he contends violated his Fifth Amendment rights.

The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary admission from the suspect before he had been advised of the *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298 (1985).

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309. Thus, under *Elstad*, because there is no evidence in this case that Delgado's statements to Agent Cromer were involuntary, his subsequent statements to Agent Noe need not be suppressed even if Agent Cromer should have, but failed to, give Delgado the *Miranda* warnings.

In *Missouri v. Siebert*, 542 U.S. 600 (2004), however, the Supreme Court carved out an exception to this general rule. *Siebert* held that when a police officer purposefully withholds *Miranda* warnings while interrogating a suspect in custody in order to obtain a full confession first, and then provides him with full *Miranda* warnings and gets him to re-confess (the "question first" technique), the post-warning confession may be suppressed even if the first statement was made voluntarily. *Siebert*, 542 U.S. at 611 ("The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.").

In *Siebert*, the police officer who conducted the interrogation of the defendant testified that he made a "conscious decision" to withhold *Miranda* warnings as an interrogation technique: question the suspect first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." *Siebert*, 542 U.S. at 605-06. The officer acknowledged that the suspect's eventual confession was largely a repeat of information obtained prior to issuing the *Miranda* warnings. *Id.* at 606.

> As Justice Kennedy explained, suppression of a post-warning confession is required if "the two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." That means that if

> an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the *Miranda* decision intended. The curative measures required are a "substantial break in time and circumstance between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement."

*United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (*quoting Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring)) (internal citations omitted).

In this case, Delgado argues that Agent Cromer and Agent Noe conspired to use this "question first" technique against him; thus, he argues, his statements to Agent Noe should be suppressed because the *Miranda* warnings were ineffective after he had already made incriminating statements to Agent Cromer earlier in the day. The undersigned, however, finds that there is no evidence in the record to support a conclusion that Agent Cromer and Agent conspired to obtain a confession from Delgado before administering *Miranda* warnings by using the "question first" technique.

Significantly, unlike the facts in *Siebert* in which one officer conducted one continuous interrogation in the same location broken up by only a short break, in this

case, the "interrogations" were conducted by two separate officers in two separate locations, after a considerable amount of time had passed. Agent Cromer arrived at the scene of the traffic stop at approximately 2:30 p.m., began talking to Delgado almost immediately, and spoke with him for about fifteen to twenty minutes at the scene, during which time Delgado admitted that he believed that the "special fuel" in the red tractor contained illegal drugs. FOF 123-24, 148, 152. Delgado then agreed to leave the scene of the traffic stop voluntarily with Agent Cromer and Investigator Estrada, and the trio met up with other agents at Shannon Mall before heading to the house on Payne Road. FOF 153-56. Along the way, Delgado spontaneously pointed out the location of the warehouse where he had previously dropped off the tractor, and while at the Payne Road residence, Delgado also volunteered to show Agent Cromer another warehouse where he had turned over the tractor to "Shaparo." FOF 168-69. Before visiting the house on Payne Road and the two warehouses, Agent Cromer, Investigator Estrada, and Delgado took time out for a detour to a Popeye's restaurant to eat dinner for forty or forty-five minutes. FOF 162-66.

Unlike the interrogation conducted in *Siebert*, the "interrogation" in this case was not one session of questions from one officer in one location. Delgado was not interrogated by Agent Noe until around 7:00 p.m. or 8:00 p.m., when Agent Noe

interviewed him at the DEA office on the 7th floor of the Federal Building. FOF 176. Neither Agent Cromer nor Investigator Estrada was present for this post-arrest interview. FOF 177. Although Agent Noe spoke with Agent Cromer throughout the day and Cromer had informed him that Delgado had been cooperating, he did not consult Cromer during the post-arrest interview. FOF 178. Furthermore, Agent Noe testified that he did not use any of those prior statements to solicit further statements from Delgado because he wanted to conduct a "chronological interview with [Delgado] of what was taking place and how and when, to get time frames and who else was involved." FOF 180-81.

In sum, the undersigned rejects Defendant Delgado's argument that Agent Cromer and Agent Noe conspired to interrogate him with a "question first" technique designed to circumvent the protections of the *Miranda* warnings. The undersigned finds that Delgado's statements to Agent Cromer are admissible because he was not in custody at the time he made the statements. Further, the undersigned finds that, even if Delgado's statements to Agent Cromer were not admissible, his statements to Agent Noe would be admissible because Agent Noe properly administered the *Miranda* warnings to Delgado, and Delgado freely and voluntarily waived his right to remain silent when he answered Agent Noe's questions. Accordingly, the

53

undersigned **RECOMMENDS** that the Motion to Suppress Evidence and Statements [33] filed by Defendant Delgado be **DENIED**.

## II.    DEFENDANT MARTINEZ'S MOTIONS TO SUPPRESS

Defendant Martinez has filed a Motion to Suppress Evidence [34] and a Motion to Suppress Statements [35]. Martinez argues that he was subjected to an illegal seizure in violation of his Fourth Amendment Rights, and was also subjected to a custodial interrogation by Agent Noe without being given *Miranda* warnings. As a result, he argues, his statements to Agent Noe should be suppressed. He argues further that he did not voluntarily consent to the search of his phone, and that the search of the phone was tainted by the illegal seizure of his person. Thus, he argues, the evidence obtained from the illegal search of the phone must be suppressed.

### A.    The Initial *Terry* Stop

In his Motions to Suppress, Defendant Martinez first argues that he was illegally seized in violation of his Fourth Amendment rights because the agents did not have a reasonable articulable suspicion that he was engaged in criminal activity, or was about to engage in criminal activity when they approached him on December

21, 2010, at the Shell gas station, or when Agent Noe asked Martinez to get into his car to go to the Sears parking lot to answer some questions.

As the Supreme Court has held, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) (internal quotes omitted) (*quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991) (*quoting Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968))). Nevertheless, while Defendant may have been subjected to a seizure under the Fourth Amendment, it does not mean that the seizure was unlawful because the Fourth Amendment only prohibits "unreasonable searches and seizures." U.S. Const. amend. IV.

The Supreme Court has held that a brief detention of a person may be justified if the Government can establish that the police officers had a reasonable suspicion based on articulable facts that such person may have engaged in illegal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir. 1989). A "reasonable suspicion" requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an]

intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion can be based on the "totality of the circumstances" and law enforcement personnel may draw on their experience and training to make inferences and deductions about the likelihood of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).

Based on the totality of the circumstances in this case, the Court finds that the Government has established that the agents had a reasonable suspicion that Defendant Martinez had engaged in, or was about to engage in criminal activity when Agent Noe first approached him at the Shell gas station on December 21, 2010.

The facts of the investigation are set forth in detail above and will not be repeated in their entirety. In sum, Agent Noe and the other agents had seized approximately 200 pounds of finished "crystal ice" and approximately 200 gallons of an "ice slurry" or a "methamphetamine slurry," for a total amount of approximately 960 pounds of methamphetamine, which was valued at over 40 million dollars. FOF 4. During the course of that investigation into the methamphetamine trafficking, they learned from Galvez that a person named "Abraham Martinez" had recruited him to process methamphetamine. FOF 6. Galvez also told them that "Abraham Martinez," along with his associate "Omar," were part of an organization controlled by someone

in Mexico named "Paco" that transported liquid methamphetamine to Atlanta in tractor trailers, and that he had observed Abraham Martinez and Omar siphon liquid methamphetamine out of the diesel tanks of tractor trailers at a location somewhere near the house on Newberry Road where the methamphetamine had been seized. FOF 6-7.

As a result of the discovery and seizure of the drugs from the Newberry Road house, and the information obtained from Galvez, the agents obtained an arrest warrant for Abraham Martinez. FOF 11. The agents also learned in the course of the investigation that a cell phone they had seized from another location likely belonged to Abraham Martinez, and they obtained a GPS search warrant for that cell phone number in an effort to locate Abraham Martinez. FOF 8-12. When the agents activated the GPS search warrant on the cell phone on December 17, 2010, it revealed that the phone was in Mississippi, traveling east on I-20, and it eventually stopped in or around Birmingham for around four and a half hours. FOF 13.

When the data collected from the GPS search warrant revealed that the phone was close to Atlanta, Agent Noe followed the GPS information on the computer in his car to the exit ramp for Fulton Industrial Boulevard, and pulled up next to a brown Ford Edge with a Mexico tag on it. FOF 15. The brown Ford Edge then traveled onto

I-285, and the GPS data showed that the phone also traveled onto I-285. FOF 16. Agent Noe followed the brown Ford Edge to the Comfort Inn and Suites off Pleasant Hill Road in Gwinnett County. FOF 17. Two individuals from the vehicle, Martinez and Juan Delgado-Paz (the brother of Defendant Delgado), went into the Comfort Inn to check into the hotel, and agents also went into the hotel to check in. FOF 18. A third person, later identified as Defendant Delgado, also appeared at the hotel and the clerk at the hotel informed the agents that she believed that Delgado had also come from the same car as the other two men. FOF 19.

On December 21, 2010, the agents resumed surveillance at the Comfort Inn and discovered from the desk clerk that the two subjects in Juan Delgado-Paz's room had checked out of the hotel, and they observed Defendant Martinez leave the hotel and move to a Holiday Inn. FOF 22. The agents conducted surveillance of the three individuals as they traveled in the brown Ford Edge, and observed them going to three or four different banks, and then back to the Comfort Inn, and learned that the subjects had checked out of both the Comfort Inn and the Holiday Inn. FOF 23-25. They also learned from employees of the Holiday Inn that the subjects had been in the Atlanta area during the time of the Newberry Road seizure and had accumulated a high dry cleaning bill as a result of a chemical smell on their clothing. FOF 26.

The agents then observed Defendant Delgado leave the Holiday Inn and walk to a red tractor, Martinez and Juan Delgado-Paz come out of the hotel, get into the Ford Edge, and the Edge drove across the interstate, followed by the red tractor, and all three of the subjects went to a restaurant called La Pantera Rosa, where they stayed for approximately 40 or 45 minutes. FOF 28-29. After the subjects left La Pantera Rosa, the agents observed Defendant Delgado walk to the red tractor, and a short time later Defendant Martinez went to the passenger door of the tractor, climbed up and stuck his head into the tractor, never fully entering it. FOF 30. Defendant Delgado then got into the tractor, and Martinez and Juan Delgado-Paz got into the Ford Edge, and both vehicles left La Pantera Rosa. FOF 31.

The agents followed the Ford Edge to a Shell gas station, where the Ford Edge pulled up to a gas pump. FOF 37. After the individuals in the Ford Edge had finished pumping gas, Agent Noe approached Defendant Martinez on the passenger side of the vehicle while DEA Agent Harvey approached Juan Delgado-Paz, who was the driver of the vehicle. FOF 38. Agent Noe parked behind the Edge, but did not block the vehicle; Agent Harvey pulled up to the left front corner of the Edge, partially blocking the vehicle. FOF 39-40. When Agent Noe approached Martinez, Agent Noe, who was dressed casually and was not armed, identified himself as a police officer, showed

59

Martinez his badge and credentials, and asked Martinez if he could talk to him and Martinez said "yes." FOF 41-42.

Agent Noe then questioned Martinez about the nature of his business in Atlanta, and Martinez responded that he was in town to purchase cars, and then went to the Ford Edge and took out some titles to vehicles from inside the vehicle to show to Agent Noe. FOF 43. Agent Noe asked Martinez if he had any identification, and Martinez showed him identification for Calixto Leal-Martinez in the form of a Mexico driver's license or passport. FOF 45. Agent Noe showed Martinez a picture of "Abraham Martinez" and asked Martinez if he was the individual in the picture, and Martinez replied "that's not me." FOF 46. Agent Noe asked Martinez if he knew the person in the photograph and Martinez responded that he had never seen him before. FOF 47.

It was then that Agent Noe asked Martinez and Juan Delgado-Paz if "they were willing to move" because the gas station was becoming crowded as vehicles were pulling up to the gas pumps. FOF 48. Agent Harvey then asked them: "Are you willing to go to an empty parking lot with us? And you're not under arrest and you don't have to go if you don't want to, but we would like for you to go so we can finish this conversation." FOF 49. In response, Martinez said "okay." FOF 50. Agent Noe

pointed towards his car and asked Martinez if he wanted to ride with him, and Martinez responded "okay." FOF 51. Martinez then got into the passenger seat of Agent Noe's truck, and Agent Noe drove approximately 125 yards behind the Shell station to a Sears parking lot. FOF 52.

Martinez argues that the evidence shows only that the agents had mistaken him for Abraham Martinez, the man for whom they had an outstanding arrest warrant. He argues that they had no reasonable articulable suspicion to believe that he was engaged in criminal activity once he advised them that he was not Abraham Martinez. The undersigned disagrees. Based on all of the information that was discovered by the agents during the course of the investigation, the undersigned finds that the agents had a reasonable articulable suspicion that Defendant Martinez was engaged in criminal activity that was related to the drug trafficking organization they were investigation, regardless of whether Martinez was actually the "Abraham Martinez" who was the subject of the arrest warrant.

The agents had uncovered evidence linking Abraham Martinez to over 900 pounds of methamphetamine that had been seized, and a cell phone number linked to Abraham Martinez had been tracked to the Ford Edge that Martinez was traveling in across Mississippi, Alabama, and Georgia. They also had evidence that the seized

methamphetamine was part of a drug trafficking organization originating in Mexico, and the Ford Edge had a Mexico license plate. In addition, they learned from Galvez that the trafficking involved the use of tractor trailers to transport liquid methamphetamine from Mexico to Atlanta, and the surveillance of Defendant Martinez indicated that he may have been traveling with a red tractor, and he had been observed sticking his head into the tractor while it was parked in the parking lot. Finally, the agents had observed Martinez, along with Delgado and Juan Delgado-Paz, exhibit suspicious behavior in checking in and out of two different hotels and traveling to three or four different banks in one day. All of this information taken together leads to a reasonable suspicion that Martinez was involved in drug trafficking. Accordingly, the undersigned finds that the agents had a reasonable suspicion that justified the initial approach of Martinez at the Shell station to detain him briefly to ask him some questions.

B.      Martinez's Statements to Agent Noe

Martinez argues further that the statements he made to Agent Noe must be suppressed because Agent Noe failed to read *Miranda* warnings to him before questioning him. Martinez argues that his continued detention after moving from the Shell station to the Sears parking lot constituted a "*de facto* arrest" that was not

supported by probable cause, and thus, he argues, his statements must be suppressed as "fruits" of the illegal seizure. Martinez also argues that he was subjected to a custodial interrogation that required *Miranda* warnings.

> 1.    Martinez was not subject to a "*de facto* arrest."

If the detention of Defendant Martinez was so prolonged that it ripened from a lawful *Terry* stop into a *de facto* arrest, the agents would require probable cause to detain him after that point. *See United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). As the Eleventh Circuit has explained:

> There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. The difference is one of extent, with the line of demarcation resulting from the weighing of a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York*, 442 U.S. 200, 209, 99 S. Ct. 2248, 2255, 60 L.Ed.2d 824 (1979); *see also United States v. Puglisi*, 723 F.2d 779, 785 (11th Cir.1984).

*Id.*

In distinguishing a true investigative stop from a *de facto* arrest, a court must not adhere to "rigid time limitations" or "bright line rules," but must use "common sense and ordinary human experience." *United States v. Hardy*, 855 F.2d 753, 759

(11th Cir. 1988) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)); *see United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989). The factors that should be considered in distinguishing an investigative stop from an arrest include "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Hardy*, 855 F.2d at 759; *see also Sharpe*, 470 U.S. at 685-686; *Acosta*, 363 F.3d at 1146. An investigatory stop does not become an arrest merely because a reasonable person would believe he was not free to leave; indeed, even handcuffing a suspect, by itself, does not automatically convert an investigative stop into an arrest. *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985); *see also Blackman*, 66 F.3d at 1576; *Hastamorir*, 881 F.2d at 1557.

After considering all four of the factors enumerated in *Hardy*, the Court finds that the detention did not ripen into a *de facto* arrest. With respect to the first factor, the law enforcement purposes served by the detention, the Eleventh Circuit has explained that "the most important [consideration] 'is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel

64

their suspicions quickly, and with a minimum of interference.'" *Gil*, 204 F.3d at 1351 (*quoting Hardy*, 855 F.2d at 759); *see also Acosta*, 363 F.3d at 1146. The Court finds that the officers were engaged in legitimate law enforcement purposes in detaining Defendant Martinez for a brief period of time to question him and attempt to discover his connection, if any, to Abraham Martinez and the 900 pounds of methamphetamine that had been seized.

Second, the Court also finds that the agents were diligent in pursuing the investigation during the detention. The question to be considered under that second factor is whether the methods the agents used were carried out without unnecessary delay. *See Sharpe*, 470 U.S. at 686-87; *Hardy*, 855 F.2d at 759-60. The Court finds that the agents acted promptly in carrying out their investigation and questioning of Martinez and nothing in the record suggests any unnecessary delay. *See Acosta*, 363 F.3d at 1146 ("Each investigatory act logically led to the next act which was done without delay.").

The third factor to be considered is whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by the agents to ensure their personal safety. *See Acosta*, 363 F.3d at 1146-47 (officers may draw weapons, handcuff a suspect, order the suspect to lie down, place a suspect in the back of a

patrol car, take a suspect's car keys, ask a suspect for his driver's license and run a check on the license for outstanding warrants for the purpose of a *Terry* stop without it becoming a *de facto* arrest). In this case, Agent Noe approached Martinez at the Shell gas station, briefly questioned him about Abraham Martinez and then, because the gas station was becoming crowded, asked him if he was willing to go voluntarily with Agent Noe to the Sears parking lot to answer more questions, to which Martinez said yes. Martinez was not handcuffed and there is no evidence that the agents attempted to touch him or pat him down for weapons. The Court finds that, under the totality of the circumstances presented in this case, the scope and intrusiveness of the detention was reasonable.

Martinez argues, however, that the scope and intrusiveness of the detention was not reasonable because his vehicle was first blocked by Agent Harvey at the Shell station and he was then moved to another location for questioning after his initial detention. The Eleventh Circuit has held that seizing a suspect and his vehicle and transporting them to another location is unreasonable if it is done so without probable cause. *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007). As the *Virden* court explained:

The seizure here was unreasonable absent probable cause because of its scope and intrusiveness. While not unduly lengthy, the seizure was accomplished by the taking of Virden's vehicle to a new location for the purposes of investigation. We have frowned upon the movement of individuals for such purposes. *See United States v. Hardy*, 855 F.2d 753, 760-61 (11th Cir.1988); *Hayes v. Florida*, 470 U.S. 811, 816, 105 S. Ct. 1643, 1647, 84 L.Ed.2d 705 (1985) ("[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."). Furthermore, to effectuate this seizure the officers handcuffed Virden, and without formally arresting him, drove him to another location. Such a seizure exceeds the boundaries of a *Terry* stop.

*Virden*, 488 F.3d at 1321.

The Court finds that this case is readily distinguishable from *Virden*. The defendant in *Virden* was removed from the vehicle in which he was driving, handcuffed and placed in the back of a patrol car, and then driven several miles away to a location where drug-sniffing dogs could be used to search the defendant's car. *Id.* at 1320. In this case, Martinez was not forcibly removed from his car nor was he moved to another location without his consent. Martinez got out of his vehicle voluntarily at the gas pump, and when Agent Noe approached him to ask him questions, there is no evidence that he resisted in any way or told Agent Noe he did not want to answer questions. While his vehicle was partially blocked by Agent

Harvey at the gas station, that detention was only a few minutes. Furthermore, Agent Noe asked him if he was willing to go to the Sears parking lot that was only 125 yards away, and Martinez said yes, and went willingly in Agent Noe's vehicle. Agent Noe did not try to force Martinez to do anything against his will, and there is no evidence that he ever touched Martinez.

The fourth and final factor to be considered is the duration of the detention. Agent Noe testified that he spoke with Martinez for eight to fifteen minutes at the gas station, and was granted permission to look in Martinez's cell phone within five to ten minutes after arriving at the Sears parking lot. FOF 67. Furthermore, although Martinez was at the parking lot for about an hour and a half, Martinez's statements were made within the first ten to twelve minutes upon arriving at the parking lot. FOF 68. Under the totality of the circumstances, the Court finds that the duration of the detention was not unreasonable. *See United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000) (handcuffing female defendant and detaining her in patrol car for seventy-five minutes was not unreasonable because there was no female officer available to search her for weapons); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (a detention that lasted approximately fifty minutes was not too long to convert a *Terry* stop into an arrest).

The Court therefore finds that, upon consideration of the totality of the circumstances and all four of the *Hardy* factors, the detention was not unreasonable and was not converted into a *de facto* arrest. Accordingly, the Court rejects Martinez's argument that he was subjected to an illegal seizure, and that all statements he made to Agent Noe must be suppressed as "fruits" of the allegedly illegal seizure.

2.      Martinez was not in custody under *Miranda*.

Martinez argues further that, even if he was not subjected to an illegal seizure, his statements to Agent Noe must be suppressed because Agent Noe failed to give him *Miranda* warnings before subjecting him to a custodial interrogation. The undersigned rejects this argument and finds that Martinez was not in custody at the time he was questioned by Agent Noe.

As discussed above in connection with Defendant Delgado's Motion to Suppress, a court must consider several factors in determining when a suspect has been taken into custody for *Miranda* purposes, including, among others, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers "brandished weapons,

69

touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1985); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)*; United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).

In this case, consideration of those factors leads to the conclusion that Defendant Martinez was not in custody at the time he was questioned by Agent Noe. The location of the stop was a gas station, and then a Sears parking lot, not a police station. Furthermore, Martinez agreed to go to the Sears parking lot willingly and was expressly advised that he was not under arrest and did not have to go. Martinez was not handcuffed and there is no evidence that Agent Noe even tried to pat him down or touch him. Agent Noe was not armed, did not brandish any weapon at Martinez, and there is no evidence that he raised his voice or ordered Martinez to do anything against his will. Finally, the evidence indicates that Martinez never asked to leave and was fully cooperative with Agent Noe until he indicated that he no longer understood English and switched to speaking Spanish.

Thus, based on the factors set forth in *Long*, the undersigned concludes that Martinez was not in custody at the time he was questioned at the gas station and the Sears parking lot and his statements to Agent Noe are not subject to suppression on

70

the basis that he did not receive *Miranda* warnings. Accordingly, the undersigned **RECOMMENDS** that the Motion to Suppress Statements [35] filed by Defendant Martinez be **DENIED**.

C.      The Search of the Cell Phone

Defendant Martinez's final argument is that his consent to allow Agent Noe to search his cell phone was not given freely and voluntarily, and thus, the evidence seized during that search must be suppressed. Martinez argues first that he was unlawfully detained and that the consent was obtained only as a direct result of that unlawful detention and must be considered involuntary. As discussed above, the undersigned finds that Martinez was not unlawfully detained or illegally seized. Thus, the Court rejects the argument that his consent was involuntary because it was the result of an allegedly illegal detention. Martinez argues further that, even if his detention was unlawful, his consent was not voluntary because he and Juan Delgado-Paz had been surrounded by police officers at the Shell station, and he was not expressly told that he had the right to refuse consent.

The Fourth Amendment protects against unreasonable police searches and seizures. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Warrantless searches are *per*

71

*se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). The Supreme Court has established that "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted).

A search conducted pursuant to consent is not unreasonable so long as the consent is freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995). The Government bears the burden of proving that the consent was given freely and voluntarily. *Schneckloth*, 412 U.S. at 248-49. Consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* at 228. Whether a consent "was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Among the relevant circumstances that may be considered are the defendant's youth, lack of education or low intelligence; the lack of any warnings regarding the accused's constitutional rights, and evidence of duress or coercion, such as deprivation of food

or sleep and prolonged detention or questioning. *Id.* at 226. The Eleventh Circuit has

also provided additional factors:

> The determination as to whether a suspect's consent is voluntary is not
> susceptible to neat talismanic definitions; rather, the inquiry must be
> conducted on a case-by-case analysis. *Schneckloth v. Bustamonte*, 412
> U.S. at 224-25, 93 S. Ct. at 2046. To assist the lower courts in making
> their determinations, this court has, on prior occasions, identified a
> non-exhaustive list of relevant factors to consider when making the
> assessment of whether consent to a warrantless search is voluntary:
> voluntariness of the defendant's custodial status, the presence of coercive
> police procedure, the extent and level of the defendant's cooperation
> with police, the defendant's awareness of his right to refuse to consent
> to the search, the defendant's education and intelligence, and,
> significantly, the defendant's belief that no incriminating evidence will
> be found. *United States v. Chemaly*, 741 F.2d at 1352 (quoting *United
> States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981)
> (footnotes omitted), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73
> L.Ed.2d 1354 (1982)).

*United States v. Blake*, 888 F.2d 795, 798-99 (11th Cir. 1989).

In consideration of these factors and the totality of the circumstances presented

in this case, the undersigned finds that Defendant Martinez was fully capable of giving

a free, voluntary, and informed consent to search his cell phone and that he did so in

this case. Agent Noe testified that, when he asked Martinez if he would allow Noe to

look in the telephone, Martinez simply handed his phone over to Agent Noe. FOF 59.

Agent Noe looked at the phone, and scrolled through some of the numbers in the

phone, and found that this telephone had called the number which was the subject of the GPS search warrant. FOF 60.

There is no evidence in the record that Martinez was so young or uneducated, or suffering from such a low intelligence that he was unable to understand that Agent Noe was asking for his consent to search the cell phone. Martinez contends that he was being questioned in English, and because his first language is Spanish, he did not understand what he was being asked. The evidence indicates that Martinez did understand Agent Noe's question, however, because he simply handed his cell phone to Agent Noe without any objection. Furthermore, the evidence in the record also establishes that Martinez understood the other questions that Agent Noe was asking him in English until Agent Noe told him that he had seen him getting into the red tractor, at which point Martinez said, "I don't understand," no longer appeared to understand English, and switched to speaking Spanish. FOF 62-65.

There is also no evidence that Martinez was subjected to prolonged questioning, sleep or food deprivation, or any mental or physical discomfort or torture that would have forced him to give his consent under duress. Indeed, the evidence is that Martinez had recently spent forty to forty-five minutes inside a restaurant called La Pantera Rosa after he had checked out of a hotel earlier in the day. FOF 24-25, 29.

74

Martinez argues further that his consent was not voluntary because he and Juan Delgado-Paz had been surrounded by police officers at the Shell station, and he was not expressly told that he had the right to refuse consent. The Supreme Court has recognized that certain encounters with law enforcement are so inherently coercive that a suspect who appears to be expressing consent may be merely "acquiescing to a claim of lawful authority," such that his apparent consent cannot be termed voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *Fikes v. Alabama*, 352 U.S. 191 (1957).

The threshold for showing "inherent coercion" is extremely high, however, and courts have found effective voluntary consent in cases in which suspects were faced with a far more intimidating show of force than was present in this case. *See, e.g., United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993) (consent to search was voluntary although the defendant had just been arrested at gunpoint and had invoked his right to remain silent); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (consent to search found voluntary after fourteen armed agents descended on suspect's house and, after being refused unlimited consent to search entire residence, threatened to return with a search warrant); *United States v. Long*, 866 F.2d 402 (11th Cir. 1989) (finding voluntary consent even after the police officers told homeowner that they

would be back with a warrant and "dig the place up" if he refused permission to search).

Thus, in consideration of the totality of the circumstances, the undersigned finds that Martinez freely and voluntarily gave his consent to allow Agent Noe to search the cell phone. Accordingly, the undersigned **RECOMMENDS** that the Motion to Suppress Evidence [34] filed by Defendant Martinez be **DENIED**.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that the Motion to Suppress Evidence and Statements [33] filed by Defendant Delgado be **DENIED**, the Motion to Suppress Evidence [34] filed by Defendant Martinez be **DENIED**, and the Motion to Suppress Statements [35] filed by Defendant Martinez be **DENIED**.

**IT IS SO RECOMMENDED** this 6th day of July, 2011.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE